Next, we have the related appeals in re OPEN MEDICINE INSTITUTE, INC. and in re Kogelnik. Gary Kaplan appearing for Appellant Spark Factor Design, Inc. and Working Dirt R2 LLC. Greg Kleiner appearing for Appley Fred Helmeset, Chapter 7 trustee and Matthew Kleiner appearing for Appley Andreas Kogelnik. Okay, Mr. Kaplan, do you want to reserve some time for rebuttal? Yes, please, your honors. Five minutes for rebuttal. Five minutes. Very good. Go ahead, please. So thank you. So I think this appeal involves both a proposed compromise under Rule 90-19 and a proposed sale of estate assets under Section 363B. And can those two aspects of the transaction be separated? Isn't it just one transaction? Well, your honors, I believe that both analyses need to be undertaken and they have slightly different standards and they both need to be satisfied. And I think this court in several cases has recognized that fact. Mickey Thompson, Golden Empire Air Rescue both recognize that principle that both analyses need to be undertaken and both need to be satisfied. And we think the bankruptcy court failed to do so properly under both analyses. And on the sale piece of this, there's some aspects of it that the court just completely failed to analyze at all. The so-called OMI estate claims, meaning the claims that the Open Medicine Institute estate had against the buyer, including Mr. Kogelnik and his companies, was not analyzed at all under Section 363B inexplicably. And on the other piece, the so-called litigation claims, which were the claims against the so-called targeted parties, which includes... Let me back you up. You said that the claims against Kogelnik weren't analyzed at all under 363. The court did discuss those claims at some length and the trustee did talk about his view of those claims, didn't he? Those were discussed, yes, but not under the 363 standard. To remind, I'm sure everybody knows this, but the standard this court has established for that is that a 363B sale must assure, quote, optimal value realized by the estate. That's what Lahajani teaches us. And the court did not undertake that analysis for the sale of the OMI estate claims, just didn't look at that issue at all. It looked at it under 1919, but it didn't look at it under 363B. How is that really different in practical terms from the 1919 standard? Well, I think it's different in this regard. In the 1919 standard, when the target is selling the claim, they're not going to sue themselves. So they're buying the claim or acquiring the claim just for the purpose of getting rid of it. On the other hand, in the 363B sale, the estate is trying to maximize value, getting as much as it possibly can for the sale of that claim. This is why we had suggested to the bankruptcy court that the court split the claims being sold, the so-called OMI estate claims and the so-called litigation claims, because then the court could essentially have separate bidding and maximize value separately for those different sets of claims. That argument suggests to me that you're contending that the court, a bankruptcy court, simply can't do what this court did. In other words, have a settlement agreement that includes a transfer of claims to a party to the settlement. Is that what you're In order to properly have that, it's supposed to do two things. One is it's supposed to value the claims, figure out what they're worth so that the estate is getting optimal value in exchange for them. And second, it's supposed to have procedures to maximize value, including appropriate bidding procedures to let other parties bid more than the proposed purchaser or target is bidding for those claims. Right. But if somebody else, let's suppose they did that and somebody else bid more for these claims than the Kogelink parties did, that would blow up the settlement, right? The settlement part of the transaction would fail in that event, wouldn't it? Well, I think that this goes back to the issue of whether the court does separate sales or sales together. If the court could have, for example, sold everything together, but allow other parties to bid without adopting the trustees onerous requirements that people have to pay three million dollars more than the proposed purchaser is paying. But the court could have done it as one sale for all the claims, including the claims that were being settled against the targeted parties and against. But but parts of this transaction simply couldn't be treated as a sale. You know, Kogelnik subordinated his claims against the estate, right? There's no way to treat that as a sale, is there? Well, I think that's that's essentially an assignment of a claim. I mean, the subordination of a claim by whom to whom? Well, the estate that if if Kogelnik essentially is going to subordinate his claim, he essentially is is transferring the value of his claim to the other creditors. But I think the subordination really was an anomaly. I think that claim is subordinated under any realistic scenario so that it was never going to be paid under any scenario. But but returning to the the issue of looking at the analysis of the sale first, in addition to not analyzing the OMI estate claim sale at all, the court in looking at the so-called litigation claim sale, in other words, the sales of the targeted parties refused to look at what the value was. The court adopted the trustee's value and the trustee value was just adopting the counterparty's value. In other words, the buyer's value itself saying, here's what I think these claims are worth. And that's an of course, the buyer is going to overvalue those claims and say the estate is getting a great deal because the estate's going to get a large percentage of any recovery from those claims. So rather than undertaking any sort of independent analysis of what those claims were worth, that was the trustee's duty. Trustee didn't do it. That was the bankruptcy court's duty. The bankruptcy court didn't do it. They all adopted the buyer's valuation for the claims and the buyer's valuation valuation was absolutely unsupported. And we there was substantial evidence refuting the buyers essentially pulled out a thin air number of 10 to 20 million dollars on the litigation claims. Switching gears to and of course, the other thing the court did not do, even though it paid lip service to doing it, was to adopt heightened scrutiny for the sale of these litigation claims to the target. That's what Fitzgerald teaches us. And the court, even though recognizing that's the standard, refused to actually apply that standard and say how it was looking using heightened scrutiny. Likewise, if the court. Well, what should the court have said in your view? What would have what should the court have said? You say it paid lip service. What will be more than lip service in your view? Well, I think the court should have instead of looking at what the target was valuing the claims against itself that could have said, I want some sort of independent analysis done by the trustee. I want the trustee to independently analyze these claims and come back and say, here's what we think these claims are worth. We've either used our own counsel. We've gotten outside consultants to take a look at the claims. We've done something to come up with a independent value rather than taking the word of the counterparty on what those claims were worth. Even where the estate has no cash to hire this independent consultant. Well, I mean, the estate look, the state has attorneys and it was able to file hundreds of pages in both this case and in the underlying case on this issue. So it could have spent some amount of money undertaking an analysis of the claims, and it just didn't do so. It abdicated its responsibility there. And then to require these additional hurdles for other parties to bid, requiring us to pay $3 million more and to first have our objection to the compromise sustained before we can even sit at the bidding table. There's no support for that. Let me ask you about that because I did have concerns about that. Did the court actually adopt the trustee's proposals for the minimum overbid? The court did. And this is, I believe, at pages 26 and 27 of the court's order, which is in our extensive record at pages 943 and 944. And the court adopted those, even though it didn't set any legal authority for doing so. And as we pointed out in our papers, this goes against this court's prior rulings in Golden Empire Air, Lahajani and Mickey Thompson, which basically say when the court either refuses to allow an auction or adopts onerous bidding restrictions that seem to chill bidding, that's error, that's grounds for reversal. And not only were they requiring us to both have our objection be sustained first in order to bid and for us to also pay $3 million more than the buyer was going to pay, for strangers coming in, they first had to establish standing to object, which, of course, for most buyers, they don't have standing in a case because they're strangers to the case, number one. Number two, they had to agree to pay $650,000 more than the buyer was paying. There's no basis for that number, for that figure. If the court had allowed proper bidding, it would have, we think, received a lot more money for the estate. The court inexplicably refused to do that, just adopted the trustee's bidding restrictions. And we think that's grounds for error under the cases I've just cited to. Switching gears, the approval of the compromise was also fatally flawed in several different respects. First of all, the court, this goes back to the issue, there's four factors. One of the factors is whether essentially it's a fair deal for the estate. And the court essentially refused to undertake an analysis of the value of the claims that were being settled, the so-called OMI estate claims. It just accepts that the trustee's valuation for these claims, and the trustee got to the coin flip determination. The court turned that around to say, well, that's roughly 50% valuation for these claims being successful. But there's no evidence in the record that supports that so-called coin flip or 50% success probability assessment. You're at the five minute mark now. If you wish to reserve, you can go ahead if you want. It's up to you. Let me, I will go ahead for a couple more minutes, then I'll reserve the rest. The other thing I'll say, and of course, in the Golden Empire Air case, when there was also a lack of any sort of supporting evidence for the trustee's figures, this court reversed there. Likewise, the other big factor was what's in the best interest of creditors. 90% of the creditors disapproved the settlement by filing objections, most of which are parties that are not before this court. In other words, strangers to this matter, including a creditor with a $60 million claim. This was not in the best interest of the estate, and the creditors let the court know that. The court brushed that aside. Finally, the court also did not take evidence on the ability to collect a judgment against the targeted parties that settled. The court accepted the trustee's analysis of that or statements on that. The trustee admitted he hadn't done any analysis. That portion of the compromise was also fatally flawed. I'll reserve the rest of my time. Thank you very much. Now we have the unusual situation of two Mr. Kleiners. I want to ask which Mr. Kleiner will go first, and how much time each Mr. Kleiner will speak for. We tried to find an extra Mr. Kleiner, and we weren't able to, Judge Ferris. We'll try to do better next time. This is Greg Kleiner. I am the attorney for Mr. Yamaset, the Chapter 7 trustee of OMI. I will speak first, and I will speak for probably about 10 minutes, unless the court doesn't have questions or something else comes up. Matthew Kleiner, counsel for Dr. Kogelnick, and maybe Basis, I'm not quite sure, will be speaking, I think, for the balance of the time, Your Honor. Okay, very good. Go ahead. Your Honor, this is a case where there are two competing sets of claims related to completely different bits of litigation, or litigation claims, I should say. The claims that the trustee had against Dr. Kogelnick, Basis, and OMCI are in a discrete box. Those were all pursuant to a settlement. And then there is a group of that the trustee had against the target parties. This, as Judge Johnson, I think, aptly put it in his order, was effectively a hostile takeover by Mr. Kaplan's clients. Let me ask you, I'm a little bit unclear on some of the defined terms. Did the targeted parties not include Mr. Kogelnick and his companies? That is correct. It says at the end, it says, and others, and that's what? I apologize to you, Judge Ferris, that was not the intent. No, there's two distinct groups. There's the buyer, who is comprised of Dr. Kogelnick, Basis, and OMCI. And those are parties in which litigation was commenced by Mr. Kaplan's clients pre-petition literally days before the bankruptcy was filed. Essentially, a red herring. Claims that really were not well laid out in state court proceedings by an entity that was on the eve of bankruptcy, sort of, here, go chase after this trustee, was sort of what my client, I think, ultimately concluded with regard to those litigation claims. The trustee did investigate those claims. Didn't think that they, as drafted, were particularly meritorious. That was set forth in the trustee's motion seeking approval of this sale. And then there's the other group of other distinct group of parties who are the targeted parties, who are Abraham Farag, Aladdin Farag. There's about six or seven Joe Kane. These are individuals who were working with Mr. Farag, Spark Factor, and Working Dirt, who essentially, within about a nine-month period, acquired all of the equity of the debtor, or 93% of the equity of the debtor. Ousted, or asked Dr. Kogelnick to leave in June of 2020. Commenced, while they were running the company, or while Dr. Kogelnick was there, putting millions of dollars in TIs on this Mountain View property. Changed the purpose of the entity from a medical corporation to a real estate corporation. And then found the only entity that might want this very distressed and overburdened lease to be one of their own entities. Took the lease off the deposit. Had the debtor continue to pay rent until weeks before the assignment on this lease. Made the assignment final. Had the debtor pay rent to it under a three-week lease of a Bivarian for $100,000. And then walked away with this lease, leaving the debtor with no assets. And a very confusing situation for the trustee to try to unravel who was there. So, if I could turn just for a moment to a couple of the items. Before you get into that, I'll jump in. I understand all that. I understand the slant, and I've read the motion. Why is that actionable? Why is what actionable? What you just said, that they transferred the lease, you know, the Bivarium into, all of this implies that these were wrongful, actionable, breach of fiduciary duty, self-dealing. But I can't, I'm having trouble understanding. So what? I mean, where is the value there? I mean, is it the trustee's view after reviewing this that the debtor never really should have filed with the leases because X, they could have done that. Where is all that information? And isn't that necessary to understand what that litany of facts means to the trustee as a potential asset of the estate? This leasehold had value. It was being able to be, it was something that could be exploited by the debtor or the trustee. Had it still been an asset of the estate, at least in theory, I don't know, because I don't know what these self-leases are that Working Dirt, Spark Factor, and Valley have entered into. But we're talking about a leasehold in Mountain View that is essentially a bio incubator. And if that is indeed, has the value that we understand it to have. But it didn't have the value prior to the need for, for Dr. Kolganek to, to go out and get the loans. Where is that? There's a disconnect here. Well, the value that the estate had in terms of developing this property was in part, the funds that were put into the estate, into the debtor, I should say more accurately, by Spark Factor and Working Dirt and the acquisition of the debtor's assets. And that did basically create, I assume, a more viable and tenable leaseable space for which tenants came in. But this space was prior to the funds coming in from Spark Factor and Working Dirt was already operating as a space which could be sublet to other entities that wanted a biospace. That's my understanding, Your Honor. And so they basically took this asset that did have some value to the debtor and co-opted it, improved it with their own funds, but making, excuse me, by loaning funds to the debtor and purchasing the debtor's equity, and then cast the debtor aside and walked away with the only asset that had any value, which was the lease. If Your Honor is asking me to look into a crystal ball and try and figure out if the trustee had received this, would he have been able to do with it? That I can't tell because we don't have any discovery, direct discovery as to what the subleases that were potentially in existence at the time of the petitioner who might otherwise want to acquire this property that had a long-term lease. But you are looking into a crystal ball because you told the bankruptcy court that you believe there was at least a 60% chance of recovering $10 million. That's correct. So what was the basis for that use of the crystal ball? Our understanding of the values of the subleases that were or likely to be there, Your Honor, trustees, as you well know, have a finite amount of facts that they work with. And it was the trustee's estimate that there was a 60% chance that we would prevail on this type of, 60-80% chance we'd prevail on this type of litigation. It's a valuable litigation. Based on what? Based on what we understood, the likely tenant mix was at this property. And it's, you know, is there direct evidence of this? No, we don't have, we did not, I don't believe we had any direct evidence of this. We had information that we received relative to what some of the pre-petition subleases were and what we understood to be subleases that had been entered into at or near the time of the bankruptcy and thereafter, Your Honor. So it is what trustees do. Trustees, as you know, don't have a, although I've used the crystal ball analogy, I now regret it, but a trustee can only know what a trustee can know based on the information that's available to it and then make an informed decision. And by that, exercise his or her business judgment. And that's what this, that's what Mr. Yamase did in this particular situation with these facts, where you have tons of money put in, the only valuable asset of the estate suddenly removed, and then looking at his best options were to enter into this fully integrated agreement with an individual and an entity, individual being Dr. Koblenek in Chapter 11 and an entity being basis to fund the litigation, because they have a huge incentive to prevail in this litigation, almost equal to that of the trustees, because the claims that Spark Factor and Working have filed in the OMI bankruptcy case are identical to the ones that are filed in Dr. Koblenek's case. And so it made sense to have an integrated deal with Dr. Koblenek and following the trustee's analysis of what these assets were worth and what he thought he might otherwise be able to do with them. We had a two month long negotiation with Dr. Koblenek and basis to reach the agreement, which is currently on appeal. At least the order of that approving that agreement is currently on appeal. I don't know if there's other questions for the court, but I'm about out of time. Okay, you should leave your five minutes to your brother in the bar, Mr. Kleiner. So I'm not sure we were even related, but thank you, Your Honor. Mr. Matthew Kleiner, go ahead, please. Good morning, Your Honor. The scope of Dr. Koblenek's case is more than the issues that were alleged against the trustees. I'm just going to be focusing on that. And that is really just one point, which related to the paramount interest of the creditors. The bankruptcy court's role in approving the settlement is really limited to finding that the settlement was negotiated in good faith and it was reasonable, fair and equitable. And it does so by analyzing the A and C factors. Doesn't it have to understand what the settlement is being valued to make that determination of reasonableness? Your Honor, again, as the trustee's attorney had argued, it has to rely on the evidence that's presented to it to make that assessment. But your co-counsel also indicated that, you know, there was an understandable analysis that tenant mix of the property is projected, but that wasn't in the record. Isn't that a problem? Your Honor, I don't think that it is. You have a 31-page record and hundreds and hundreds of pages that were submitted. A 31-page record that just cites conclusions isn't support. I mean, what is the evidence that was presented of what the parties negotiated for the valuation to reach the conclusion that there was a 60% chance of success that was then used as kind of an obstacle for any further bids? What's in the record as to the 60% of $10 million? Well, it goes to the value of this leasehold interest here, as well as the amount of the loans that were put in and what the targeted parties here, the appellants did in order to property into a real estate deal, as opposed to it being a medical deal. That's not going to get you past the motion for summary judgment, probably not even a motion to dismiss. I mean, what are the specific facts that were presented about this analysis and valuation? Again, I can just kind of reiterate what I've already said as it relates to the amount in those exact numbers came from. The trustee has a discretion to look at the information that's before it and based on its best ability, make those decisions, your honor. Thank you. So just going briefly back to this third point, the case law is clear that if it's not necessary for the bankruptcy trustee to establish that every single one of the factors are present, it's looking at all of the four A and C factors and determining whether or not those factors as a whole support settlement. And in this case, in the appeal with Dr. Kovanec, the appellants didn't raise any of the other three factors. They only focused on the paramount interest of the creditors. And so that in and of itself does not give the court sufficient ability to determine whether or not all four factors as a whole do in fact weigh against approving the of the other factors. There's still no evidence that the bankruptcy court abuses discretion in considering the paramount interest of the creditors. As the bankruptcy court went to in great detail, it considered and compared all the terms of the competing offers. It evaluated the successes and outcomes of the pending litigation and potential claims. It examined the costs to the estate to pursue those claims and assessed the chances of recovering from those claims, given the fact that Dr. Kovanec was already in bankruptcy and that the targeted parties did have funds from which recovery could be obtained. So in the end, the bankruptcy court did fully and properly exercise its discretion to conclude that the fourth factor did weigh in favor of approving the settlement. And since the other three factors weren't addressed, the court doesn't have the ability to look at the other factors. So with that, unless there's any further questions, we submit on the documents in the argument that's been made today. Any further questions? No. Okay, thank you. Mr. Kaplan, back to you for a little under four minutes. So please go ahead. Thank you, your honors. Yes. So back to this question of trying to value the leasehold at the time it was assigned, we had presented evidence in the bankruptcy court. In that regard, we would direct the panel to Mr. Farag's declaration in opposition to the proposed settlement. This is in the record, excerpts of record at pages 132 through 135. And it actually walks through the very issues that this panel just raised and that opposing counsel candidly acknowledged has no contrary evidence. But let me show you the evidence we do have. So first, at the time this leasehold was assigned, again, there's a lease that OMI Open Medicine Institute held at the time. It was passed to in rent of over $400,000 because it had no cash, couldn't pay rent. The remaining lease rent was over $28 million at that time because the lease ran through 2028. So even in a bankruptcy filing in which that lease claim would be capped at 15%, that's about $4.6 million of damages that would be owed to the landlord even under a capped claim. And there were several other million dollars of liabilities that the OMI estate was relieved of by virtue of this assignment. In addition to the future... When you say, I didn't understand what you meant about a $400,000 pass-through. I'm sorry, past due rent. In other words... Past due, I'm sorry. Okay. That's better now. I understand. Thank you. So between the past due rent of roughly $400,000, a little more, and the future rent, again, capped at 4.6, that was already $5 million that the landlord would have been owed by OMI had the lease not been assigned and my client took all those liabilities on. There was roughly another million dollars owed to other parties, either parties that had performed construction on the property and would have had mechanics liens against OMI to get that paid or obligations to sub-leases under their leases. But we walked through this analysis. The total amount that the estate was saved in liabilities, the OMI estate was just under $7 million. We walked through this in detail. Now let's look at the other side of the coin. What you've heard the council say is that the lease itself still had a lot of value. I mean, even assuming OMI could have come up with the cash-to-pennies obligations based on the sub-lease income. Well, we walked through all that detail as well. The actual lease obligation that OMI had to pay at that time was $320,000 per month. The actual sub-lease income being received at that time was about $200,000 per month. So this left a hole, in other words, that loss each month of $120,000 per month. So why did your clients bother to pull the lease out of OMI? Because I think they had invested a lot of money before. They were sold a bag of goods by Mr. Kogelnik. But that's some cost, right? That money's gone. So what's their future benefit? I think the concept was they were going to try and turn this business around. In other words, they had already invested a lot of money into OMI and the thought was that if they put more money into it, including putting TIs into it and taking on the lease, that they could make a go of it. They were trying to rescue their investment. Some could say it's good money after bad. In hindsight, it probably was. But at the time, that was the impetus for them doing it. But regardless of whether they were smart or dumb in doing that, the real issue is, was the OMI estate hurt or helped by it? It was certainly helped by it and there's no indication that it was hurt by it, that it lost a leasehold that had a value of anything like $10 million or $20 million, whatever number it is. The leasehold had a negative value and the estate was saved like I said, of more than $7 million by the lease being assigned. So the underlying litigation claims are valueless and so therefore, the settlement was a bad deal for the OMI estate. All right. Okay. Thank you very much both sides for your good arguments. The matter is submitted.
judges: FARIS, BRAND, SPRAKER